**Pursuant to Ind.Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**



ATTORNEY FOR APPELLANT:

**RONALD K. MCSHURLEY**
Muncie, Indiana

ATTORNEYS FOR APPELLEE:

**ROBERT J. HENKE**
DCS Central Administration

**JAMES MOORE**
DCS, Delaware County Office
Muncie, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| IN RE THE INVOLUNTARY TERMINATION OF THE PARENT-CHILD RELATIONSHIP OF K.R.: | ) ) ) ) | |
| D.R. | ) ) | |
| Appellant-Respondent, | ) ) | |
| vs. | ) ) | No. 18A02-1202-JT-104 |
| THE INDIANA DEPARTMENT OF CHILD SERVICES, | ) ) ) | |
| Appellee-Petitioner. | ) ) ) | |

APPEAL FROM THE DELAWARE CIRCUIT COURT
The Honorable Alan K. Wilson, Judge
The Honorable Brian Pierce, Master Commissioner
Cause No. 18C02-1105-JT-10

**December 26, 2012**

**FRIEDLANDER, Judge**

D.R. (Father) appeals the involuntary termination of his parental rights to his child, K.R. Father challenges the sufficiency of the evidence supporting the trial court's judgment.

We affirm.

Father is the biological father of K.R., born in March 2002. The facts most favorable to the trial court's judgment reveal that in May 2010, K.R. was removed from Father's care and placed in licensed foster care after the local Delaware County office of the Indiana Department of Child Services (DCS) substantiated a report of neglect involving Father and K.R. During its investigation, DCS learned that K.R. had an undiagnosed developmental delay, had "flunked" kindergarten twice, and was in jeopardy of not passing the first grade. *Exhibits* at 5. The previous month, DCS also had received a report that seventeen pills from K.R.'s ADHD prescription medication were unaccounted for despite the fact Father had just filled the prescription five days earlier. Additionally, one week prior to K.R.'s removal, DCS received another report that Father had returned home one evening "appearing impaired and became angry and broke a large antique mirror." *Id.*

After removing K.R. from Father's care, DCS filed a petition alleging K.R. was a child in need of services ("CHINS"). Unfortunately, this was not DCS's first encounter with the family, as K.R. had been adjudicated a CHINS several years earlier while in the care of

2

the child's mother.[1] The prior CHINS case involving the mother was eventually closed in 2007 after the mother voluntarily relinquished her parental rights to K.R. and Father obtained custody of K.R.

A dispositional hearing was held during the underlying proceedings in July 2010. Father, who was incarcerated on drug-related charges, did not attend the hearing but was represented by counsel. Following the hearing, the trial court issued an order formally removing K.R. from Father's custody and granting wardship to DCS. The trial court's dispositional order also directed Father to participate in a variety of tasks and services designed to improve his parenting deficiencies and to facilitate reunification with K.R. Specifically, Father was ordered to, among other things: (1) refrain from consuming and/or selling any illegal controlled substances and only take prescription medication as directed with a valid prescription; (2) maintain a legal and stable source of income sufficient to support the family; (3) submit to a parenting assessment and a drug and alcohol evaluation and follow any resulting recommendations; (4) submit to random drug screens; (5) ensure that K.R. is properly clothed, fed, and supervised and meet all the child's medical and mental health needs in a timely and complete manner; and (6) attend all scheduled visitations with K.R. and comply with all visitation rules.

Father's participation in court-ordered services was inconsistent and ultimately unsuccessful. Father was released from incarceration in August 2010 and began attending

---

[1] The parental rights of K.R.'s biological mother were terminated prior to the initiation of the underlying CHINS proceedings. Mother does not participate in this appeal. We therefore limit our recitation of the facts to those pertinent solely to Father's appeal of the juvenile court's judgment terminating Father's parental rights to K.R.

weekly visits with K.R. in September 2010. After the first three visits, however, Father failed to show for the next scheduled visit on October 8, 2010. Father thereafter continued to miss the next four consecutive visits, two scheduled in October and two in November 2010. As a result of Father missing so many visits, DCS case manager Jason Phipps sent Father a letter emphasizing the importance of attending all scheduled visits with K.R. to the reunification process. After receiving the letter from case manager Phipps, Father attended the next scheduled visit on November 30, 2010. Father thereafter failed to attend any additional visits with K.R.

In late December 2010, Father was arrested and incarcerated on battery charges for an incident of random violence directed at two children ages thirteen and fourteen while still on supervised probation. In August 2011, the trial court approved a plea agreement and Father was convicted of class C felony battery resulting in serious bodily injury and class D felony battery resulting in bodily injury. Father was sentenced to an eight-year term of incarceration, with five years executed, in the Department of Correction.

Meanwhile, in May 2011, DCS filed a petition seeking the involuntary termination of Father's parental rights to K.R. An evidentiary hearing on the termination petition took place in December 2011. During the termination hearing, DCS presented clear and convincing evidence establishing Father had failed to successfully complete all of the trial court's dispositional goals and remained incapable of providing K.R. with a safe and stable home environment. Also not insignificant, at the time of the termination hearing, Father remained incarcerated with an earliest possible release date not until August 2015.

At the conclusion of the termination hearing, the trial court took the matter under advisement. In January 2012, the trial court entered its judgment terminating Father's parental rights to K.R. Father now appeals.

Initially, we note that when reviewing the termination of parental rights, we will not reweigh the evidence or judge the credibility of the witnesses. *In re D.D.*, 804 N.E.2d 258 (Ind. Ct. App. 2004), *trans. denied*. Instead, we consider only the evidence and reasonable inferences that are most favorable to the judgment. *Id.* In deference to the trial court's unique position to assess the evidence, we will set aside the court's judgment terminating a parent-child relationship only if it is clearly erroneous. *In re L.S.*, 717 N.E.2d 204 (Ind. Ct. App. 1999), *trans. denied*. Thus, if the evidence and inferences support the trial court's decision, we must affirm. *Id.*

Here, the trial court made detailed findings in its order terminating Father's parental rights to K.R. Where the trial court enters specific findings of fact and conclusions thereon, we apply a two-tiered standard of review. *Bester v. Lake Cnty. Office of Family & Children*, 839 N.E.2d 143 (Ind. 2005). First, we determine whether the evidence supports the findings, and second we determine whether the findings support the judgment. *Id.* "Findings are clearly erroneous only when the record contains no facts to support them either directly or by inference." *Quillen v. Quillen*, 671 N.E.2d 98, 102 (Ind. 1996). A judgment is clearly erroneous only if the findings do not support the trial court's conclusions or the conclusions do not support the judgment thereon. *Quillen v. Quillen*, 671 N.E.2d 98.

5

The traditional right of parents to "establish a home and raise their children is protected by the Fourteenth Amendment of the United States Constitution." *In re M.B.*, 666 N.E.2d 73, 76 (Ind. Ct. App. 1996), *trans. denied*. Although parental rights are of a constitutional dimension, the law provides for the termination of these rights when parents are unable or unwilling to meet their parental responsibilities. *In re R.H.*, 892 N.E.2d 144 (Ind. Ct. App. 2008). In addition, a trial court must subordinate the interests of the parents to those of the child when evaluating the circumstances surrounding the termination. *In re K.S.*, 750 N.E.2d 832 (Ind. Ct. App. 2001).

Before an involuntary termination of parental rights may occur in Indiana, the State is required to allege and prove, among other things:

(B)     that one (1) of the following is true:

(i)     There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.

(ii)    There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.

(iii)   The child has, on two (2) separate occasions, been adjudicated a child in need of services.

(C)     that termination is in the best interests of the child . . . .

Ind. Code Ann. § 31-35-2-4(b)(2)(B) and (C) (West, Westlaw current through 2012 2nd Reg. Sess.).[2] The State's burden of proof for establishing these allegations in termination cases "is one of 'clear and convincing evidence.'" *In re G.Y.*, 904 N.E.2d 1257, 1260-61 (Ind. 2009) (quoting Ind. Code Ann. § 31-37-14-2 (West, Westlaw current through 2012 2nd Reg. Sess.). If the court finds that the allegations in a petition described in section 4 of this chapter are true, the court *shall* terminate the parent-child relationship. I.C. § 31-35-2-8 (West, Westlaw current through 2012 2nd Reg. Sess.).

On appeal, Father challenges the sufficiency of the evidence supporting the trial court's findings as to subsections (b)(2)(B) and (C) of the termination statute. *See* I.C. § 31-35-2-4(b)(2). Specifically, Father complains that DCS "presented very little evidence upon which the [trial court] could determine whether or not [Father's] parental rights should be terminated," and points out that DCS "called only two (2) witnesses." *Appellant's Brief* at 6. Father's assertions are unavailing.

At the outset, we note that DCS needed to establish only one of the three requirements of subsection (b)(2)(B) by clear and convincing evidence before the juvenile court could terminate his parental rights. *See In re L.V.N.*, 799 N.E.2d 63 (Ind. Ct. App. 2003). Here, the trial court found DCS presented sufficient evidence to satisfy the first two subsections of (b)(2)(B) of the termination statute. *See* I.C. § 31-35-2-4(b)(2)(B)(i) & (ii). Because we find it dispositive under the facts of this particular case, however, we shall consider only whether

---

[2] We observe that Indiana Code section 31-35-2-4 was amended by Pub. L. No. 48-2012 (eff. July 1, 2012). The changes to the statute became effective after the filing of the termination petition involved herein and are not applicable to this case.

clear and convincing evidence supports the trial court's findings regarding subsection (b)(2)(B)(i), namely, whether there is a reasonable probability the conditions resulting in K.R.'s removal or continued placement outside Father's care will not be remedied.

In making such a determination, a trial court must judge a parent's fitness to care for his or her child at the time of the termination hearing, taking into consideration evidence of changed conditions. *In re J.T.*, 742 N.E.2d 509 (Ind. Ct. App. 2001), *trans. denied*. The court must also evaluate the parent's habitual patterns of conduct to determine whether there is a substantial probability of future neglect or deprivation of the child. *In re M.M.*, 733 N.E.2d 6 (Ind. Ct. App. 2000). Similarly, courts may consider evidence of a parent's prior criminal history, drug and alcohol abuse, history of neglect, failure to provide support, and lack of adequate housing and employment. *A.F. v. Marion Cnty. Office of Family & Children*, 762 N.E.2d 1244 (Ind. Ct. App. 2002), *trans. denied*. The trial court may also consider the services offered to the parent by a county office of the Indiana Department of Child Services and the parent's response to those services, as evidence of whether conditions will be remedied. *Id.* Finally, a trial court need not wait until a child is irreversibly influenced by a deficient lifestyle such that his or her physical, mental, and social growth are permanently impaired before terminating the parent-child relationship. *In re E.S.*, 762 N.E.2d 1287 (Ind. Ct. App. 2002).

Here, in determining that there is a reasonable probability the conditions resulting in K.R.'s removal and/or continued placement outside of Father's care will not be remedied, the trial court made detailed findings regarding Father's significant criminal history and ongoing

criminal activities throughout the CHINS case, refusal to consistently attend scheduled supervised visits with K.R., and lack of progress in being able to demonstrate he is capable of providing a safe home for K.R. due in large part to his repeated periods of incarceration. Additionally, the trial court specifically found that Father's "earliest possible release date is August 17, 2015, at which time the child will be 13 years old." *Appellant's Appendix* at 69. The juvenile court further found that "based on [Father's] extensive history of criminal activity and convictions [,] as well as a history of failing numerous opportunities of rehabilitation, it is unlikely that [Father] will be released from his incarceration on his earliest possible release date. The trial court thereafter indicated that "based on the foregoing, there is a reasonable probability that the conditions that resulted in the child's removal will not be remedied." *Id*. Our review of the record leaves us convinced that these findings are supported by abundant evidence.

During the termination hearing, both the court-appointed special advocate (CASA) and DCS case manager Phipps recommended termination of Father's parental rights. In so doing, Phipps confirmed that Father had failed to complete all the court-ordered reunification services, most notably, the multiple scheduled visits with K.R. prior to Father's incarceration in December 2010. Phipps further testified that he had informed Father that "visitation was a very important step in the reunification process." *Transcript* at 26. Similarly, the CASA informed the court that Father had "had long enough to make positive changes since obtaining sole custody of [K.R.] in 2007." *Id.* at 40. The CASA further confirmed that Father has "an extensive criminal history," and had demonstrated an "overall . . . lack of

interest and ability to care for [K.R.]. . . ." *Id.* at 41.

Father's own testimony also lends support to the trial court's termination order. During the termination hearing, Father confirmed that he has a "long history of breaking the law" and that he was incarcerated and serving his current sentence for committing "battery on children" while already on probation for committing another felony. *Id.* at 37-38. When asked to explain why he missed so many scheduled visits with K.R. during the CHINS case, Father answered, "I ain't gonna make no excuses. . . . I had trouble, car trouble a couple a times . . . . Other than that I really can't recall what the reason was. Sometimes I was running late. It would just be too late to even go." *Id.* at 34-35.

As previously explained, a trial court must judge a parent's fitness to care for his or her child at the time of the termination hearing, taking into consideration the parent's habitual patterns of conduct to determine the probability of future neglect or deprivation of the children. *In re D.D.*, 804 N.E.2d 258 (Ind. Ct. App. 2004), *trans. denied*. Where a parent's "pattern of conduct shows no overall progress, the court might reasonably find that under the circumstances, the problematic situation will not improve." *In re A.H.*, 832 N.E.2d 563, 570 (Ind. Ct. App. 2005). Moreover, we have previously explained that the failure to exercise the right to visit one's child demonstrates a "lack of commitment to complete the actions necessary to preserve [the] parent-child relationship." *Lang v. Starke Cnty. Office of Family & Children,* 861 N.E.2d 366, 372 (Ind. Ct. App. 2007), *trans. denied.* Here, Father has demonstrated a persistent unwillingness and/or inability to take the actions necessary to show he is capable of refraining from criminal activity and of providing A.P. with the safe and

10

stable home environment the child needs.  After reviewing the record in its entirety, we conclude that clear and convincing evidence supports the trial court's specific findings discussed above. These findings, in turn, provide ample evidence to support the court's ultimate decision to terminate Father's parental rights to K.R.  Father's arguments to the contrary amount to an invitation to reweigh the evidence, which we may not do.  *See In re D.D.*, 804 N.E.2d 258.

We now turn to Father's assertion that DCS failed to prove that termination of his parental rights is in K.R.'s best interests.  In determining what is in the best interests of a child, the trial court is required to look beyond the factors identified by the Indiana Department of Child Services and look to the totality of the evidence.  *McBride v. Monroe Cnty. Office of Family & Children*, 798 N.E.2d 185 (Ind. Ct. App. 2003).  In so doing, the court must subordinate the interests of the parent to those of the child.  *Id.*  The court need not wait until a child is irreversibly harmed before terminating the parent-child relationship. *Id.*  Moreover, we have previously held that the recommendations by both the case manager and child advocate to terminate parental rights, in addition to evidence that the conditions resulting in removal will not be remedied, is sufficient to show by clear and convincing evidence that termination is in the child's best interests.  *In re M.M.*, 733 N.E.2d 6 (Ind. Ct. App. 2000).

In addition to the findings previously cited, the trial court made several additional pertinent findings relating to K.R.'s best interests.  Specifically, the trial court noted that the "missed visits consistently and predictably resulted in behavioral setbacks and emotional

stress on the child which manifested themselves in the form of a reduced ability to follow directions, increased argumentativeness, refusal to do homework[,] and going to the bathroom in [the child's] pants." *Appellant's Appendix* at 68. The court further found that K.R. had "demonstrated consistent improvement in his intellectual and behavioral development while in foster care," and that the child "needs a safe, stable, secure[,] and permanent environment in order to thrive. [Father] has shown neither the inclination nor the ability to provide the child with such an environment." *Id.* at 69. Based on these and other findings, the trial court concluded that termination of Father's parental rights is in K.R.'s best interests. These findings and conclusion, too, are supported by the evidence.

During the termination hearing, both case manager Phipps and K.R.'s mental health therapist Craig Hollis confirmed that Father's failure to attend scheduled visits during the CHINS case "caused a lot of emotional stress on [K.R.]" and was "very detrimental to [K.R.] and his behaviors." *Transcript* at 10, 26. Phipps went on to testify that these missed visits caused K.R.'s negative behaviors, including "defecating his pants" and "acting out both at school as well as in the foster home," which previously had been subsiding, to begin again. *Id.* at 26.

The CASA informed the trial court that at the time K.R. was placed in foster care he "needed several months of physical therapy to learn how to run, to jump[,] and to just walk like a healthy young boy." *Id.* at 41. The CASA further reported that K.R. was doing much better in foster care, but that he still needs "extensive developmental and behavioral therapy which is still ongoing." *Id.* In addition, the CASA testified that K.R. continues to struggle

with a lot of "anger management issues" and that the CASA recommended termination based on Father's "extensive criminal history" and overall "lack of interest and ability to care for [K.R.]." *Id.*

This Court has repeatedly recognized that "[i]ndividuals who pursue criminal activity run the risk of being denied the opportunity to develop positive and meaningful relationships with their children." *Castro v. State Office of Family & Children*, 842 N.E.2d 367, 375 (Ind. Ct. App. 2006), *trans. denied.* Based on the totality of the evidence, including Father's current incarceration with an earliest possible release date not until 2015, significant history of criminal activities, and failure to successfully complete and/or benefit from any of the court-ordered reunification services, coupled with the testimony from case manager Phipps and the CASA recommending termination of the parent-child relationship, we conclude that there is sufficient evidence to support the trial court's determination that termination of Father's parental rights is in K.R.'s best interests. *See, e.g., In re A.I.*, 825 N.E.2d 798 (Ind. Ct. App. 2005) (testimony of court-appointed advocate and family case manager, coupled with evidence that conditions resulting in continued placement outside home will not be remedied, is sufficient to prove by clear and convincing evidence termination is in child's best interests), *trans. denied*.

This Court will reverse a termination of parental rights "only upon a showing of 'clear error'– that which leaves us with a definite and firm conviction that a mistake has been made." *In re A.N.J.,* 690 N.E.2d 716, 722 (Ind. Ct. App. 1997) (quoting *Egly v. Blackford Cnty. Dep't of Pub. Welfare*, 592 N.E.2d 1232, 1235 (Ind. 1992)). We find no such error

here.

Judgment affirmed.

BROWN, J., and PYLE, J., concur.